UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION


UNITED STATES OF AMERICA,          Case No. 3:18-CR-00385-JJH

              Plaintiff,          Toledo, Ohio

    vs.                                Friday, August 3, 2018

SHILOH JACKSON,

           Defendant.


TRANSCRIPT OF DETENTION HEARING PROCEEDINGS
BEFORE THE HONORABLE JAMES R. KNEPP, II
UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

For the Government:          Thomas P. Weldon,
                             *Assistant United States Attorney*



For the Defendant:          Donna M. Grill, *Esquire*




Official Court Reporter:  Stacey L. Kiprotich, RMR, CRR
                          United States District Court
                          1716 Spielbusch Avenue
                          Toledo, Ohio 43604
                          (419) 213-5520



Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.

I N D E X

PAGE

DIRECT EXAMINATION OF GLENDA D. TROUTMAN
BY MS. GRILL:                                    8

CROSS-EXAMINATION OF GLENDA D. TROUTMAN
BY MR. WELDON:                                   17

REDIRECT EXAMINATION OF GLENDA D. TROUTMAN
BY MS. GRILL:                                    25

DIRECT EXAMINATION OF WILLIE J. TROUTMAN
BY MS. GRILL:                                    26

CROSS-EXAMINATION OF WILLIE J. TROUTMAN
BY MR. WELDON:

1                    (Proceedings commenced at 10:10 a.m.)

2                    THE COURT:  The next matter before the Court

3          this morning is the United States of America versus Shiloh

4          Jackson.  Case Number 3:18-cr-385.  Mr. Jackson is charged

10:10:28  5          with violation of Title 21, United States Code,

6          Section 841(a)(1) and (b)(1)(C), distribution of Fentanyl.

7          He is present in the courtroom this morning with his

8          appointed counsel, Deputy Defender Grill.

9               On behalf of the Government is AUSA Weldon.

10:10:50 10               I'm also joined by Officer Mendoza from Pretrial

11          Services for what is a detention hearing which is scheduled

12          for this morning.

13               Mr. Jackson, I want to explain to you that a detention

14          hearing is certainly different than a trial.  The Rules of

10:11:12 15          Evidence don't apply.  We can hear testimony.  We can hear

16          arguments.  You can call any witnesses you wish to call,

17          but, at the end, it's not like a trial.  The most notable

18          big difference is the Rules of Evidence don't apply; so we

19          can have actual testimony.  We can have proffers and so

10:11:34 20          forth.

21               Counsel, have each of you received and had an

22          opportunity to review both the initial Pretrial Service's

23          Report and the addendum?

24                    MR. WELDON:  I have, Your Honor.  Thank you.

10:11:44 25                    MS. GRILL:  Yes, Your Honor.  Thank you.

1          THE COURT:  For the purposes of today only,

2     and without asking you to be bound by anything in there for

3     any other purpose, do either of you see any factual

4     inaccuracies that should be called to my attention before I

10:12:02  5     rely on the facts set forth in either of those reports?

6          MR. WELDON:  Nothing from the Government,

7     Your Honor.

8          MS. GRILL:  Your Honor, I was just

9     double-checking regarding the residence.  It's my

10:12:14  10    understanding that at the time of the behavior surrounding

11    the allegations in the indictment, my client was not living

12    with his mom and stepdad.  I'm not certain if that's in

13    there.  I was trying to double-check how she wrote that.

14    But he was originally charged in state court, and when he

10:12:36  15    was bonded out for this in state court, then he was residing

16    with his mom and stepdad, which I think that will become

17    clearer as they testify.

18          THE COURT:  And I think that's how -- I think

19    that's how it's written because it talks in terms of the

10:12:50  20    present tense, "resides."  It doesn't talk about has resided

21    for any period of time.

22          However, just to be clear, it is my understanding that

23    the alleged conduct which underlies the allegations here, I

24    believe, did take place in or around the City of Marion, if

10:13:14  25    I'm understanding that correctly.  So in any event, thank

1    you for that.  Certainly underlying the fact that there

2    may -- wouldn't be inconsistent with this report to hear

3    testimony that he was living somewhere else at that point in

4    time.

10:13:36  5         Mr. Jackson, I believe the last time we were together,

6    I might have pointed out or you might have heard some

7    comments about presumption, how it applies in a drug case

8    punishable by more than ten years -- ten years or more in

9    jail.  That arises under Section 3142, which we call the

10:13:58 10    Bail Reform Act.  It lists the factors and considerations

11    that we're supposed to use in deciding whether or not

12    someone is entitled to bond in federal court.  Not everyone

13    is entitled to bond.  There's generally a presumption in

14    favor of releasing people, unless the Government shows that

10:14:20 15    that cannot be safely or effectively done.  However, there

16    are certain classes of cases, most notably as it relates to

17    this case, as I said, in any drug case punishable by ten

18    years or more, there's a presumption that you cannot obtain

19    bond.  That's the bad news.  The good news is it is called a

10:14:44 20    rebuttable presumption; so you can potentially convince me

21    that that presumption was meant for everybody else and not

22    you, or meant for other people but not you and it shouldn't

23    apply to this case.  And you would do that by showing me

24    that there are valid terms and conditions which can

10:15:02 25    adequately assure the safety of the community and your

1    further appearance in the case, that you are not going to

2    skip out.

3        If you do that, that is, overcome the presumption,

4    then the burden shifts to the Government, and it becomes

10:15:18  5    their burden to prove that there are no terms and

6    conditions.  And I understand this whole thing is a little

7    esoteric, but if you overcome the presumption against it,

8    then the Government has the burden to show that there are no

9    terms and conditions which can assure your further

10:15:36  10    appearance in the case.  And they have to show that by

11    what's call a preponderance of the evidence, which is a

12    little bit more than -- it's kind of 51 percent kind of

13    thing, or -- and/or they have to show that there are no

14    terms and conditions which can adequately or reasonably

10:15:54  15    protect the safety of other persons in the community.  They

16    have a higher burden on that call.  They have to show that

17    one by clear and convincing evidence, which none of which

18    have anything to do with proof beyond a reasonable doubt,

19    which is the standard that would be in play at trial.

10:16:10  20        And this whole thing about presumption against you has

21    nothing to do with the presumption of innocence which will

22    cloak you if you go into a trial.  That's a whole different

23    deal.  In a trial, you begin the trial with a presumption of

24    innocence, and it only disappears if the Government

10:16:26  25    overcomes it with proof beyond a reasonable doubt.

1      Well, there's nothing like that going on here today.

2      Instead, the presumption that we begin with is there's a

3      presumption against you, which you have to overcome, and

4      then the burden shifts to the Government.  So that's the

10:16:38  5      easiest way I can explain something that's probably a little

6      complicated and probably a little confusing, but that's my

7      best shot at it.

8      Noting the potential punishment here being up to

9      30 years in prison, I don't see any credible basis to

10:16:58 10      contend that the base presumption doesn't apply.  So,

11      therefore, since you have the burden of proof, I will ask

12      you and your counsel to proceed.  And, again, you can call

13      any witnesses you want to call.  You can proceed with the

14      proffers or testimony.  You can testify yourself, if you

10:17:16 15      want to, although I don't believe that would be prudent,

16      although you can consult with Ms. Grill about that.

17          With that, Ms. Grill.

18              MS. GRILL:  Your Honor, thank you.  Just to

19      outline our proposed conditions for the Court and for the

10:17:32 20      record:  We're proposing that Shiloh get released to the

21      custody of his mom and stepfather, Glenda and Willie

22      Troutman.  Further, that he be on home detention with

23      electronic monitory or GPS monitoring to be determined by

24      Pretrial Services.  The family has a piece of property that

10:17:56 25      they are also willing to post and able to post.  I believe

1    the value of that property is in the report by Pretrial

2    Services; so we would be putting that forward, and then, of

3    course, any treatment or whatever else, you know, conditions

4    the Court would feel necessary for him.

5                    THE COURT:  Okay.  Thank, Ms. Grill.

6                    MS. GRILL:  And we have Glenda Troutman here

7    in the courtroom to testify today.

8                    THE COURT:  Mr. Weldon, do you want to make

9    any introductory statement?

10                   MR. WELDON:  No, Your Honor.  Thank you.

11                   THE COURT:  Okay.  Please proceed, Ms. Grill.

12                       (Witness was sworn)

13                   THE COURT:  Please be seated, ma'am.  As soon

14   as you are comfortable, or as comfortable as anyone ever is

15   in a federal courtroom, could you tell us your full name,

16   please?

17                   THE WITNESS:  Glenda D. Troutman.

18                   THE COURT:  Go ahead, Ms. Grill.  And, ma'am,

19   could you pull microphone down towards you just a little

20   bit.  There you go.  Perfect.

21              **DIRECT EXAMINATION OF GLENDA D. TROUTMAN**

22   **BY MS. GRILL:**

23   **Q**    What city and state do you reside in?

24   **A**    In Marion, Ohio.

25   **Q**    How long have you lived in Marion?

1    **A**    50 years.

2    **Q**    I'm sorry?

3    **A**    50.

4    **Q**    50 years.

5         How long have you been at your particular address?

6    **A**    Four and a half years.

7    **Q**    And, Glenda, are you related to Shiloh?

8    **A**    I'm his mother.

9    **Q**    Okay.  And who are you residing with at your current

10   address?

11   **A**    My husband, Willie Troutman, and our son, Kobe

12   Troutman, but he's just there on spring break since he's in

13   college; so he'll be gone in two weeks back to college.

14   **Q**    What's his first name?  I'm sorry.

15   **A**    Kobe, K-o-b-e.

16              THE COURT:  Where does he go to school?

17              THE WITNESS:  Hocking College.

18              THE COURT:  Is he going to be a forest ranger

19   or something?  Everybody wants to be a forest ranger who

20   goes to Hocking College.  That's what I hear.

21              THE WITNESS:  He wants to be a music producer.

22              THE COURT:  Music producer?

23              THE WITNESS:  Yeah.

24              THE COURT:  I'm sorry, Ms. Grill.

25              MS. GRILL:  That's fine.

| | | | |
|---|---|---|---|
| | 1 | **Q** | Are you employed? |
| | 2 | **A** | Yes, ma'am. |
| | 3 | **Q** | And where are you employed? |
| | 4 | **A** | JPMorgan Chase. |
| 10:20:22 | 5 | **Q** | And what do you do? |
| | 6 | **A** | I investigate fraud. |
| | 7 | **Q** | And how long you been doing that? |
| | 8 | **A** | Two years. |
| | 9 | **Q** | Two years? |
| 10:20:28 | 10 | **A** | Yes. |
| | 11 | **Q** | I'm sorry.  I'm having a little hard time hearing. |
| | 12 | | Part of it, we have air conditioning happening up here. |
| | 13 | **A** | I talk soft too.  Sorry. |
| | 14 | **Q** | How long have you been employed at Chase? |
| 10:20:38 | 15 | **A** | Two years. |
| | 16 | **Q** | Two years total, okay. |
| | 17 | | What kind of work did you do before that? |
| | 18 | **A** | I was an office manager for Phoenix Services. |
| | 19 | **Q** | Okay.  And what are your normal work hours right now? |
| 10:20:48 | 20 | **A** | I go in every morning at 7:00.  Mondays I get off at |
| | 21 | | 4:30, Tuesdays I get off at 6:30, Wednesdays I get off at |
| | 22 | | 3:30, and Thursdays and Fridays I get off at 1:30. |
| | 23 | **Q** | For the most part of a regular workday.  Is that fair |
| | 24 | | to say? |
| 10:21:06 | 25 | **A** | Yes. |

1    **Q**    And is your husband employed?

2    **A**    He is medically retired.

3    **Q**    How long has he been retired?

4    **A**    Since February of -- officially February 17th, but he

10:21:20  5    hasn't worked since February 16th.

6    **Q**    Okay.  And before we went on the record, the

7    Magistrate talked about this a little bit:  Do you

8    understand what Shiloh is charged with?

9    **A**    Yes, ma'am.

10:21:30 10    **Q**    And can you tell the Court what your understanding of

11    his charges are?

12    **A**    Of having a prescription medication, that he could go

13    to prison for up to 30 years.

14                    THE COURT:  You said a prescription

10:21:50 15    medication, ma'am?

16                    THE WITNESS:  I thought that's what they said

17    to me.

18                    THE COURT:  No.  It was probably -- I think

19    the allegation is that it was a mixture containing Fentanyl.

10:22:02 20    So I don't know.  I guess we can ask Mr. Weldon.  Was it

21    more of a heroin-type substance or pills or --

22                    MR. WELDON:  22 grams of Fentanyl, Schedule II

23    controlled substance.

24                    THE COURT:  Okay.

10:22:18 25                    THE WITNESS:  I don't know one pill, one drug

1    from another drug, so. . .

2                    THE COURT:  I just wanted to make sure you

3    weren't misunderstanding something.  I don't think it was

4    like Oxycotin pills or something.  I think it was -- the

10:22:30  5    allegation is that it's Fentanyl, which is the stuff that

6    kind of mixes with other stuff.  We call it heroin or

7    something like that, so. . .

8                    MS. GRILL:  I think, Your Honor, it started as

9    a prescription medication.

10:22:44 10                    THE COURT:  This Fentanyl did?

11                    MS. GRILL:  I'm not saying that Fentanyl.  I'm

12    saying Fentanyl in general.

13                    THE COURT:  Oh, clearly.  It was pain patches.

14                    THE WITNESS:  Yeah, that's what I thought

10:22:54 15    Fentanyl was, a prescription.

16                    THE COURT:  You're right.

17    **BY MS. GRILL:**

18    **Q**    And you're understanding he's facing prison time?

19    **A**    Yes, ma'am.

10:22:58 20    **Q**    And we talked about that?

21    **A**    Yes, ma'am.

22    **Q**    And you're here today for a bond hearing, right?

23    **A**    Yes.

24    **Q**    So we've talked about this I think pretty extensively.

10:23:10 25    Are you willing to serve as Shiloh's custodian?

1     **A**     Yes, ma'am.

2     **Q**     And I think it would best if you explain to the Court

3     what your understanding of what a being a custodian would

4     be.

10:23:22  5     **A**     Being responsible.  Make sure that he's home, not in

6     the streets doing things he shouldn't be doing.

7     **Q**     Okay.  So if he was given a list of rules that he has

8     to follow, you understand you would be there to help enforce

9     whatever rules they are?

10:23:38  10     **A**     Yes.

11     **Q**     And if he were on home detention, that means he can't

12     leave unless it's a prescheduled event that's okay with

13     Pretrial Services.

14     **A**     Yes.

10:23:48  15     **Q**     Do you understand that?

16           Are you willing to have him come live with you?

17     **A**     Yes, ma'am.

18     **Q**     So this case could last for several months.

19           Do you understand that?

10:24:02  20     **A**     Yes.

21     **Q**     And if he were to be released, that means he would be

22     living with you for several months.

23     **A**     Yes.

24     **Q**     And I wanted to go back a little bit.  He's recently

10:24:14  25     resided with you for a little bit, right?

1    **A**    Right, after he was arrested.

2    **Q**    Okay.  And when you say "arrested," are you saying in

3    state court?

4    **A**    Yes.  Yes, ma'am, back in March.

10:24:28  5    **Q**    So for about how long was he staying with you?

6    **A**    From when he got out on bond.

7    **Q**    Okay.

8    **A**    It was around that -- I don't know -- 7th or so of

9    March until he was arrested on July 2nd.

10:24:42  10    **Q**    Okay.  So from March to July, he was with you and your

11    husband?

12    **A**    Correct.

13    **Q**    Did he have rules he was supposed to follow at that

14    point?

10:24:50  15    **A**    We always have rules at our house, yes, ma'am.

16    **Q**    Okay.  Did he have court-ordered rules?

17    **A**    No.

18    **Q**    Did he have rules that you wanted him to follow?

19    **A**    Yes.

10:25:00  20    **Q**    And was he following those rules?

21    **A**    Yes.

22    **Q**    Was he doing well in your opinion during that time

23    period?

24    **A**    Yes.  The morning that he was arrested for this, they

10:25:14  25    were -- he went to my daughter's.  They were going to take

1       the kids to the fair.

2       **Q**     Okay.  Not getting into any other trouble?

3       **A**     No.  He's been home every night.  Kids also came

4       because they got out of school; so they were there for the

10:25:28  5     summer.  They are still there for the summer.  And he was

6       taking care of them because I work.  So they are his

7       responsibility; so he was feeding and taking care of his

8       children.

9       **Q**     So you mentioned rules.  What kind of rules do you

10:25:38 10     have in your house?

11      **A**     No one --

12                      THE COURT REPORTER:  What's that?

13                      THE COURT:  No one smokes and drinks in my

14      home.

10:25:44 15     **A**     No smoking or drinking in my home, no profanity, which

16      I don't have an issue.  He's always been respectful; so I

17      don't worry about him using improper language.  And no

18      outside friends, just his children and their mother,

19      relatives.

10:26:02 20     **Q**     And he was abiding by all of those during that time

21      period?

22      **A**     That is correct.

23      **Q**     Now, you said your husband is not currently working,

24      right?

10:26:14 25     **A**     That's correct.

1   **Q**    So is he usually home?

2   **A**    Yes.  Except for on Tuesday mornings, yes.

3   **Q**    What's Tuesday mornings?

4   **A**    He goes to breakfast with his buddies.

10:26:26  5   **Q**    Okay.  And you understand if he were to come and stay

6   with you, this is a big responsibility?

7   **A**    Yes, ma'am.

8   **Q**    And if he were to break a rule or even you had

9   concerns he was thinking about breaking a rule, you would

10:26:48  10   need to contact Pretrial Services.

11          Do you understand that?

12  **A**    Yes.

13  **Q**    You willing to do that?

14  **A**    Yes.

10:26:54  15  **Q**    I mean, that could cause Shiloh to get in trouble.

16  Would that be okay?

17  **A**    Yes.

18  **Q**    Okay.  So if he were to violate rules, it's up to you

19  to turn him in, and the likelihood is he's going to end up

10:27:10  20  in jail while this case is pending.

21  **A**    Yes.

22  **Q**    And you're still willing to make sure those rules are

23  followed?

24  **A**    Yes.

10:27:30  25          MS. GRILL:  I don't think I have anything

| | |
|---|---|
| 1 | further, Your Honor. |
| 2 | THE COURT:  Mr. Weldon. |
| 3 | **CROSS-EXAMINATION OF GLENDA D. TROUTMAN** |
| 4 | **BY MR. WELDON:** |
| 10:27:34  5 | **Q**    Good morning.  How are you? |
| 6 | **A**    I'm fine.  How are you? |
| 7 | **Q**    How old is your son? |
| 8 | **A**    29. |
| 9 | **Q**    How long has he lived with you in your residence over |
| 10:27:44 10 | that 29 years? |
| 11 | **A**    15 years. |
| 12 | **Q**    So after his -- the most recent arrest that you just |
| 13 | spoke about -- |
| 14 | **A**    Yes. |
| 10:27:54 15 | **Q**    -- prior to that, was he living with you? |
| 16 | **A**    No. |
| 17 | **Q**    Where was he living? |
| 18 | **A**    With his girlfriend and children. |
| 19 | **Q**    In Marion? |
| 10:28:00 20 | **A**    Lewis Center. |
| 21 | **Q**    That's closer to Columbus maybe? |
| 22 | **A**    Yes. |
| 23 | **Q**    At what point did he move out of your house would you |
| 24 | say? |
| 10:28:10 25 | **A**    When he was a freshman in high school. |

1  **Q**     Okay.  Kobe Troutman, is that your stepson?

2  **A**     That's my son.

3  **Q**     Your son as well?

4  **A**     Yes.

10:28:24  5  **Q**     Okay.  Are you aware that Kobe was with Shiloh when he

6  was arrested for the that we're here for today?

7  **A**     Yes.

8  **Q**     Okay.  You're also aware, I'm sure, that your son has

9  had a lot of trouble with the law since -- basically since

10:28:42  10  he's been an adult and maybe before that?  I don't know.

11  **A**     As when speaking -- I knew about the time when he was

12  arrested and went to prison.

13  **Q**     Okay.

14  **A**     But the other things I learned from -- Ivonne was

10:29:00  15  going over some things that I didn't know about, no.

16  **Q**     Okay.  He's been in and out of jail pretty much I'm

17  not going to say continuously, but he's had numerous

18  contacts with the law from the age of 18 until present.  And

19  he's been on court supervision before, which is a lot like

10:29:18  20  what we're doing here, and he's not been able to comply with

21  court orders during that time period.  Are you aware of

22  that?

23  **A**     No.  When you say -- what do you mean by he didn't

24  comply?

10:29:28  25  **Q**     Well, he has been -- for instance, in 2008, he was

1    on -- did he some prison time, as you may know, and then he

2    was placed on probation.  And while he was on probation, he

3    continued to get into trouble while he was on probation;

4    meaning whatever conditions the Court had ordered for him,

10:29:52 5    he violated those conditions.  Were you aware of that?

6    **A**    No, because from my understanding -- you're talking

7    about then he had to go back to prison because they said he

8    didn't follow the procedures?

9    **Q**    Well, yeah.  He would be on probation, for instance,

10:30:06 10    and then he would violate -- he would violate the court

11    rules and then he would get violated.  That's what I'm

12    talking about; he would mess up while he was on release.

13    **A**    And that just happened one time out of several times

14    is what you're saying?

10:30:20 15    **Q**    Well, it happened at least once during two different

16    periods of probation.  He was on probation for trafficking

17    and drugs, and it also looks like he was on probation for

18    trafficking in cocaine as well.  And during that time

19    period, he managed to find himself in trouble as it related

10:30:40 20    to that.  It apparently happened more recently when he was

21    in jail for possession of heroin and tampering with

22    evidence, and then he was violated again for possession of

23    drug paraphernalia during that time period.

24    **A**    When was that?

10:30:58 25    **Q**    June 18th of 2015.

1    **A**    Okay.  So now you're confusing me because you just

2    said while he was --

3    **Q**    On probation.

4    **A**    Okay.  Which -- are you talking about his -- this now?

10:31:14   5    Or what days are you talking about?

6    **Q**    No, no, no.  I'm saying in the past --

7    **A**    Okay.

8    **Q**    -- when he's been released by a court or been under

9    court supervision, and those are several different times --

10:31:24  10    **A**    And when he's released, he was released at his

11    father's -- to his father.

12    **Q**    Okay.

13    **A**    He was not released to me.

14    **Q**    Understood.  That's what I'm getting at.

10:31:34  15    **A**    Okay.

16    **Q**    I'm saying are you aware that this had happened in the

17    past.  Now you're aware of that?

18    **A**    I just knew about the time in 2000 and -- when he had

19    gotten in trouble in 2008 --

10:31:42  20    **Q**    Uh-huh.

21    **A**    -- and they said he violated.

22    **Q**    Right.

23    **A**    But the vile -- my understanding from her, when she

24    came to my house -- because she had not been able to reach

10:31:54  25    him at his father's.  And I went out and found him and took

1    him to court myself first thing.

2    **Q**    Okay.

3    **A**    I don't know if your records show that, but I located

4    him and I took him.  And the violation she said was because

10:32:02    5    he was not reporting.

6    **Q**    I'm not saying any of this had to do with you by the

7    way.  Okay?

8    **A**    Okay.  I'm just saying when you said Kobe was with him

9    that day.

10:32:12    10    **Q**    I'm referring to the charges he's present here

11    today --

12    **A**    Okay.

13    **Q**    -- for, Kobe was with him in the vehicle when he was

14    pulled over.  Were you aware of that?

10:32:22    15    **A**    Yes.

16    **Q**    Okay.

17    **A**    And but also aware Kobe wasn't charged with anything.

18    Kobe didn't know what was going on.  I don't want it to seem

19    like -- because my child was in the home.  Kobe has never

10:32:32    20    been in trouble for anything.

21    **Q**    Right.  And I see that from the report.  But I also

22    know that Kobe is someone who you say is going to be living

23    with you when your other son is going to be released.

24    **A**    Kobe returns to college on August 15th.

10:32:44    25    **Q**    Okay.

1    **A**      Kobe didn't even know --

2    **Q**      I'm not saying he did.  Don't misconstrue anything I'm

3    saying here.  What I'm saying is:  Are you okay with Shiloh

4    coming to live with you while Kobe is in the house?

10:32:56 5    **A**      Yes.  We've already talked about what happened.  I

6    expressed how I felt about what happened.  I don't feel that

7    Shiloh would purposely -- you know -- would not purposely do

8    anything to harm anyone in my home.

9    **Q**      Right.  You don't think Shiloh would have put him in a

10:33:16 10   bad spot necessarily in any way?

11   **A**      No.  I mean, there's an eight year difference, but

12   he's still his big brother.  And I would pray -- I would

13   like to think his job would be to protect him and not to

14   cause him harm.

10:33:30 15   **Q**      Okay.  Well, I'm sure that -- I have no reason to

16   doubt in any way what you're saying.  The problem is, he did

17   put him in harm's way.  He took him to a drug deal and he

18   was pulled over after the drug deal.  Whether or not he -- I

19   mean, I will take you on your word, Kobe probably knew

10:33:48 20   anything about it.  But he did put him in harm's way, didn't

21   he?

22   **A**      Yes, he did.

23   **Q**      You realize that what he's been charged with,

24   distribution of Fentanyl, is -- it's a deadly substance.  Do

10:34:04 25   you understand that?  Have you heard about Fentanyl?

1    **A**    Yes.

2    **Q**    Merely touching the stuff can cause people to

3    overdose, just a smidgen of it on your hands.  It's

4    extremely deadly.  And because of the distribution of

10:34:14  5    Fentanyl, there's a crisis going on.  There's an overdose

6    epidemic happening in Marion --

7    **A**    Yes.

8    **Q**    -- and all over the place.  So that this particular

9    type of drug is deadly.  It's a deadly drug.  You also

10:34:32  10    understand -- I'm sure you've heard that -- you said you

11    understood that your son is looking at a significant period

12    of time in prison if he's convicted of this offense?

13    **A**    Yes.

14    **Q**    Okay.  What makes you -- let me back up.

10:34:46  15    While he was living with you when he bonded out in

16    state court --

17    **A**    Yes.

18    **Q**    -- did he make trips to Columbus or routinely -- or

19    you say he was living in Lewis Center.  Did he make trips to

10:34:56  20    Columbus during the time period that he was bonded out to

21    you?

22    **A**    From March to July?

23    **Q**    Uh-huh.

24    **A**    Not that I'm aware of, no.

10:35:04  25    **Q**    He stayed with you at the house?  He never traveled

1    outside of, say, Marion in your -- to your knowledge?

2    **A**    To my knowledge, no.

3    **Q**    Okay.  Were you aware that he would sometimes reside

4    in Columbus, or stay there prior to him living with you?

10:35:22  5    **A**    You mean before March?

6    **Q**    Uh-huh.

7    **A**    He lived there.

8    **Q**    Okay.  While you're at work -- I guess what I'm

9    expecting to hear is that your husband would, then, be

10:35:42  10   watching your son while you're at work?

11   **A**    Yes.

12   **Q**    And he's retired as you put it?

13   **A**    Yes, he's medically retired.

14             MR. WELDON:  Okay.  I have no further

10:35:52  15   questions.

16             THE COURT:  Are we going to hear from him

17   today?

18             MS. GRILL:  Yes, Your Honor.  He's just

19   sitting outside; separation of witnesses.

10:36:02  20            THE COURT:  Okay.  Ma'am, who owns the

21   property where you live?

22             THE WITNESS:  Jay McComas.

23             THE COURT:  So you rent?

24             THE WITNESS:  Yes, sir.

10:36:12  25            THE COURT:  What is this other property that

| | |
|---|---|
| 1 | you're posting?  Is that a rental property? |
| 2 | THE WITNESS:  Yes. |
| 3 | THE COURT:  Okay.  I don't think I have any |
| 4 | questions.  Do you have any follow-up, Ms. Grill? |
| 10:36:36  5 | **REDIRECT EXAMINATION OF GLENDA D. TROUTMAN** |
| 6 | **BY MS. GRILL:** |
| 7 | **Q**     Glenda, is it your daughter -- |
| 8 | **A**     Yes. |
| 9 | **Q**     -- living in the property that you are willing to |
| 10:36:46 10 | post? |
| 11 | **A**     Yes. |
| 12 | MS. GRILL:  Thank you.  Nothing further. |
| 13 | THE COURT:  Thanks.  You can step down.  You |
| 14 | can stay in the courtroom while we get Mr. Troutman. |
| 10:37:02 15 | THE WITNESS:  Thank you. |
| 16 | THE COURT:  Morning, sir.  Come on forward and |
| 17 | we'll swear you in. |
| 18 | (Witness was sworn) |
| 19 | THE COURT:  Please be seated.  Would you tell |
| 10:37:32 20 | us your full name, please? |
| 21 | THE WITNESS:  Willie Jerome Troutman. |
| 22 | THE COURT:  Your given name is Willie? |
| 23 | THE WITNESS:  Yes. |
| 24 | THE COURT:  And middle name with a G or a J? |
| 10:37:44 25 | THE WITNESS:  J-e-r-o-m-e. |

1          THE COURT:  Thank you.  Go ahead, Ms. Grill.

2          MS. GRILL:  Thank you.

3     **DIRECT EXAMINATION OF WILLIE J. TROUTMAN**

4     **BY MS. GRILL:**

10:37:50  5     **Q**    Mr. Troutman, I'm going to move this along a little

6     bit since we heard from your wife, Glenda.  Okay?

7     **A**    Okay.

8     **Q**    So you're living in Marion, Ohio, correct?

9     **A**    Correct.

10:37:58 10    **Q**    You reside with your wife, Glenda?

11    **A**    Correct.

12    **Q**    You guys have been living at that address for a few

13    years now?

14    **A**    Yes.

10:38:06 15    **Q**    Okay.  And you're Shiloh's stepdad, right?

16    **A**    Right.

17    **Q**    You're not working right now?

18    **A**    No.

19    **Q**    Your wife said you are medically retired?

10:38:16 20    **A**    Correct.

21    **Q**    Were you working before your retirement?

22    **A**    At Whirlpool.

23    **Q**    How long had you been there?

24    **A**    18 years.

10:38:22 25    **Q**    That's a long time.  Enjoying retirement?

1    **A**    Yes, I am.  Yes, I am.

2    **Q**    Are you home for the most part?

3    **A**    Yes, most of the time.

4    **Q**    I heard you have Tuesday morning breakfast with the

10:38:38  5    guys?

6    **A**    Yes, I do, with my brother and sisters.

7    **Q**    Okay.  Doctor appointments, then, I'm assuming?

8    **A**    Yes, for my condition.

9    **Q**    I'm going to take an educated guess that Glenda might

10:38:52  10   have you run some errands for her on occasion?

11   **A**    Oh, yeah.

12   **Q**    For the most part, however, if Shiloh were to come

13   live with you, could you watch him?

14   **A**    Yes, I could.  I would do anything for my wife.

10:39:06  15   **Q**    And let's talk about that.  It would be a big job,

16   right?  The two of you would be acting as co-custodians.

17   Are you willing to do that?

18   **A**    Yes.

19   **Q**    And Shiloh would be potentially living with you for

10:39:18  20   several months.  I don't know how long this case is going to

21   last.  Is that okay with you?

22   **A**    That's fine.

23   **Q**    And while she's at work, you're going to be, you know,

24   the primary person who is going to be responsible for making

10:39:32  25   sure that Shiloh isn't getting into trouble.  Is that okay

1    with you?

2    **A**    Yes.

3    **Q**    So if he were to do something or even think about

4    doing something wrong, do you understand you would need to

10:39:44 5    turn him in to Pretrial Services?

6    **A**    Yes.

7    **Q**    And frankly I'm not saying you couldn't tell your wife

8    you turned him in, but that responsibility would be

9    independent of Glenda.

10:40:00 10        Do you understand that?

11   **A**    What do you mean?

12   **Q**    In other words --

13              THE COURT:  That responsibility would be to

14   me, not to her.  Basically you'd be a co-custodian.  So you

10:40:08 15   would be taking an oath -- and are taking an oath -- that if

16   he did something he wasn't supposed to do, you would either

17   call Pretrial Services or call the police.  That's -- and

18   that's an obligation that you would have to me.

19              THE WITNESS:  Oh, that makes me

10:40:24 20   independently --

21              THE COURT:  That makes you independent.  You

22   would be -- you and I have a relationship here the same as

23   your wife and I would in terms of being custodians for the

24   Court.  That's what's being proposed here.  And I think what

10:40:36 25   Ms. Grill is asking you is:  Do you -- A, do you understand

1    that; and, B, are you willing to take that on knowing that

2    when you make that phone call, what's probably going to

3    happen is the Marshals or the police are going to come and

4    arrest your stepson and take him back to jail.  And that may

10:40:52  5    be a stressor on your relationship with your wife, but all

6    things -- you don't know me from a bale of straw, but I

7    promise you, you would rather have stress with your wife

8    than with me.  Okay?

9                    THE WITNESS:  Yes, I understand.

10:41:08 10                    MS. GRILL:  Thank you, Your Honor.  I didn't

11    want to be quite so blunt about it, but I'm glad the Court

12    was.

13    **Q**    And just as the Magistrate said, you -- because you're

14    being presented as a co-custodian, you have a separate

10:41:24 15    responsibility.

16            Do you understand that?

17    **A**    Yes.

18    **Q**    Glenda has a separate responsibilities too.

19            Do you understand that?

10:41:36 20    **A**    Yes.

21    **Q**    I understand you guys have some rules in your house;

22    is that right?

23    **A**    Yes.

24    **Q**    I've heard things like you can't drink, can't smoke,

10:41:44 25    no other extra people at the house, at least, when Shiloh

1    was staying there; is that right?

2    **A**    Correct.

3    **Q**    Okay.  You guys run a tight ship?

4    **A**    Yes, we do.

10:41:56  5    **Q**    And Shiloh was there with you from about March until

6    July-ish; is that right?

7    **A**    That's about right.

8    **Q**    The beginning of July.

9          How was that?  How was that going for you?  How did

10:42:08  10    you think it was going?

11    **A**    It was going fine.  I mean --

12                THE COURT:  We're having trouble hearing you,

13    Mr. Troutman.  Keep your voice up just a little bit for us.

14    **A**    Nothing out the way, no stress or nothing.

10:42:24  15    **Q**    So was he following your rules --

16    **A**    Yes.

17    **Q**    -- you guys have at your house?

18    **A**    Yes.

19    **Q**    And respecting those?

10:42:30  20    **A**    Yes, ma'am.

21    **Q**    Doing what he's supposed to do?

22    **A**    Yes, ma'am.

23    **Q**    Okay.  Was he having extra non-family members come

24    around your home or anything like that?

10:42:42  25    **A**    Well, friends.

1    **Q**    Okay.  And were they friends that you approved of to

2    have at the house?

3    **A**    Yes, they was.

4    **Q**    Okay.  Was he bringing folks around that you didn't

10:42:54 5    approve of?

6    **A**    No.

7    **Q**    Was he seeing his kids on a pretty regular basis?

8    **A**    Yes.

9    **Q**    Okay.  And if the Court were to release Shiloh, he

10:43:06 10    would be on home detention, and that means he's got to be

11    home, unless it's okay for him to go somewhere, and the

12    people who decide if it's okay is Pretrial Services.

13    Do you understand that?

14    **A**    Yes.

10:43:18 15    **Q**    And are you, you know, willing to enforce him obeying

16    those rules?  Like, if he wants to go somewhere, run up to

17    the store, he can't go unless Pretrial Services approves

18    that.

19    Do you understand?

10:43:34 20    **A**    Yes.

21    **Q**    And you might have to be the guy saying "Shiloh, you

22    can't go."

23    Do you understand that?

24    **A**    I understand.

10:43:40 25    **Q**    And if he did walk out the door, what do you have to

1    do then?

2    **A**    Have to call.

3    **Q**    Okay.  I think everyone here wants to make sure that

4    both you and your wife understand the importance of being a

10:43:56  5    custodian.  And you understand if you don't follow the

6    rules, it is you and Glenda that could get in trouble.

7        Do you understand that?

8    **A**    Yes, I do.

9    **Q**    Okay.  At the same time, you're not going to get in

10:44:08  10    trouble if you guys follow the rules.

11        Do you understand?

12    **A**    Yes.

13    **Q**    Okay.  I know you said you are medically retired.  Is

14    there anything about your medical condition that would

10:44:30  15    inhibit your ability to be a custodian to Shiloh?

16    **A**    No.

17    **Q**    Okay.  And you know Shiloh is facing a potentially

18    significant prison sentence?

19    **A**    Yes, I do.

10:44:48  20            MS. GRILL:  I don't think I have anything

21    else, Your Honor.

22            THE COURT:  Mr. Weldon.

23        **CROSS-EXAMINATION OF WILLIE J. TROUTMAN**

24    **BY MR. WELDON:**

10:44:50  25    **Q**    Good morning, Mr. Troutman.

1    **A**    How are you doing?

2    **Q**    Good.  You're aware of the charges that face Mr.

3    Jackson here, correct?

4    **A**    Correct.

10:45:02 5    **Q**    Are you also aware of the type of drug that was

6    involved in this particular case?  He's being charged with

7    distributing Fentanyl.  Are you aware of that?

8    **A**    Yes.

9    **Q**    Okay.  Prior to -- I understand Shiloh was living with

10:45:20 10   you in March after this happened for some time; is that

11   right?

12   **A**    Correct.

13   **Q**    Prior to that, had he ever lived under your roof

14   before that time period?

10:45:30 15   **A**    No.

16   **Q**    Okay.  And have you -- understanding he's your

17   stepson -- and I know you also said that you would do

18   anything to help your wife -- what is your relationship with

19   Shiloh as you sit here today?

10:45:44 20   **A**    It's pretty much pretty good.  I mean, we have our

21   moments, but pretty much it's a good relationship.

22   **Q**    Are you aware of his past in terms of the trouble that

23   he's had in the past with the law?

24   **A**    Yes.

10:46:00 25   **Q**    Okay.  You say that you're willing to do this, you're

1     willing to have him come live with you.  Do you have any

2     reservations about that at all?

3     **A**     No, I don't.

4               MR. WELDON:  All right.  Thank you.

10:46:22  5               THE COURT:  I think I asked the questions I

6     would have asked when I barged in on you, Ms. Grill, there;

7     so you can step down, Mr. Troutman.  Thank you.

8          Ms. Grill, any further witnesses or argument?

9               MS. GRILL:  Your Honor, I don't have any

10:46:42  10    further witnesses at this time.

11               THE COURT:  Any witnesses, Mr. Weldon?

12               MR. WELDON:  No, Your Honor.

13               THE COURT:  Okay.  At least by way of a

14    proffer, can you tell me the circumstances of the arrest at

10:46:54  15    least in this case?  You made some reference to his brother,

16    I guess, being with him.

17               MR. WELDON:  Yes, Your Honor.  If I might.  I

18    can include that in my proffered statements as it relates to

19    the strength of the evidence in the case.

10:47:10  20               THE COURT:  Okay.  That would be fine.  That's

21    fine.

22               MR. WELDON:  Or I can just detail it for

23    Your Honor.

24          Essentially, this matter began a couple of days before

10:47:24  25    Mr. Jackson's arrest.  There were a number of telephone

1    calls placed to Mr. Jackson to arrange a purchase of ounces

2    of what was told to be heroin at the time.  Eventually Mr.

3    Jackson met up with a confidential informant, and he drove

4    to that location with Kobe in the vehicle with him.  The

10:47:48  5    transaction occurred.  Mr. Jackson was pulled over in the

6    vehicle, leaving that -- the drug transaction with Kobe in

7    the vehicle.  He was arrested.  Buy money was found on his

8    pocket.  The drug transaction itself is videotaped.  So from

9    that standpoint, we believe that the case is strong against

10:48:10 10    Mr. Jackson in terms of his ultimate guilt in the matter,

11    not to presuppose that one would occur but we believe that

12    the evidence is strong in that regard.

13              THE COURT:  Okay.

14              MR. WELDON:  Obviously, Your Honor, if I might

10:48:28 15    launch into our request for his detention.  And we do so

16    pursuant to, number one, the presumption in favor of

17    detention for this type of offense, and also the factors in

18    3142; namely, the history and characteristics of Mr. Jackson

19    who is before you today.  I note that Pretrial Services is

10:48:44 20    recommending detention -- the Government agrees -- both for

21    the risk of nonappearance and for the danger to the

22    community.

23         Mr. Jackson is facing a substantial period of

24    incarceration if he's found to be a career offender in this

10:49:00 25    case, and the Government believes that he is.  And as

1    that -- and as a result of that, and in addition to his

2    prior record, the Government would be filing a motion for

3    sentencing enhancement pursuant to Title 21, Section 851,

4    which would obviously elevate his statutory maximum up to

10:49:18  5    30 years but would easily encompass the career offender

6    guideline range of 210 to 262 months, which has been

7    proposed as that range prior to any acceptance of

8    responsibility.

9        I would also note the nature of the offense.  This is

10:49:34 10   a very serious offense.  Obviously involves Fentanyl, which

11   is a grave concern to the Government and the district, both

12   in Marion and around the district, for the very serious

13   effects of Fentanyl on both law enforcement and users.  The

14   Court's well aware, I'm sure, of the danger of that

10:49:56 15   particular drug.

16       And mainly of what's concern to the Government, and I

17   believe that custodians -- I mean, I don't think you could

18   necessarily come up with better custodians in this

19   particular situation, but I think that despite their good

10:50:16 20   names and their good will in this particular case, I think

21   that returning Mr. Jackson to the same community where he

22   was pedaling -- allegedly pedaling these drugs would be

23   folly.

24       His record belies any belief that he could possibly

10:50:34 25   comply with the Court's directions.  He's been in and out of

1       jail, as I mentioned earlier, almost continuously -- unless

2       he's been incarcerated for those periods of time -- since

3       the age of 19, since 2008.  And the Court is well aware that

4       his adjustment to Court order of probation or supervision

10:50:54  5   hasn't been good.  He has violated before.  It looks as in

6       this case that one of the individuals that would be residing

7       with Mr. Jackson was possibly -- and I'm not saying that his

8       brother and any knowledge whatsoever.  He very likely had no

9       knowledge.  But Mr. Jackson chose to take him to a drug

10:51:20 10  deal, and this is a person that's going to be residing with

11      him, at least, until the remainder of the summer.  I

12      understand he's going off to college.

13          But we have grave concerns about his release, and I do

14      believe he's a flight risk given the amount of time he's

10:51:34 15  looking at.  He hasn't faced this kind of time in state

16      court before.  This is quite different and in terms of the

17      time stacked up against Mr. Jackson if he's convicted of

18      this offense.

19          And we believe there is clear and convincing evidence

10:51:48 20  that he is also a danger to the community based on his

21      background which, as Pretrial Service's report points out,

22      has some history or charges involving violence.  And we also

23      believe that based on the nature of this offense that he

24      will also be a danger to the community, and so we ask that

10:52:06 25  he be detained.

1            THE COURT:  We got a little out of sequence

2     there with the arguments, but I probably caused that myself;

3     so I would be glad to hear your thoughts.

4            MS. GRILL:  Your Honor, thank you.  And just

10:52:24  5     briefly, as I think otherwise we're just repeating the same

6     thing a million times.

7         The custodians that we've presented obviously are

8     fantastic.  I genuinely believe they would be there to watch

9     him.  Here's what's also interesting in this case:  We have

10:52:42 10     some evidence to show that they would because they were

11     doing it for a while.

12         I can't -- you know, I can't make Shiloh's criminal

13     history go away.  But what I do know is that he wasn't

14     living with these folks when this stuff was happening.  And

10:52:58 15     we do know from March until the U.S. Government decided to

16     take this case up, he was on bond, and he was doing okay,

17     and he wasn't getting into trouble.

18            THE COURT:  He appears to have, at least, been

19     consuming marijuana during that time.

10:53:14 20            MS. GRILL:  I don't know.

21            THE COURT:  I think he admitted to that to

22     pretrial.

23            MS. GRILL:  What I do know is he wasn't doing

24     that in their house.

10:53:22 25            THE COURT:  Well, I don't know.

1          MS. GRILL:  And this would be a different

2     situation because he would be on home detention, and he

3     wasn't on home detention then either.

4          If he has an issue with marijuana, that can be

10:53:36  5     addressed through treatment.  That's what treatment is there

6     for, not jail.  He is facing a long time.  He's got several

7     children.  I think in Shiloh's mind, he wants time to

8     obviously spend time with his family, not knowing what the

9     future is going to bring as it relates to this case.

10:54:00 10          He doesn't -- you know, the guidelines, while they may

11     place people in categories, at least, in my estimation,

12     don't necessarily capture the real story.  In his particular

13     case, he's got previous F4s.  They are not F2, you know,

14     major drug offender cases.  They are F4s.  He doesn't have a

10:54:30 15     violent past.  The one charge from 2012, he ended up

16     convicted of contributing to the unruliness.  I don't know

17     how that's a violent charge of any sort.

18          The 2014, through our investigation we figured out --

19     I don't know where -- everything was dismissed, but there's

10:54:56 20     two felonious assault charges listed here, and all we could

21     find was an aggravated robbery charge that was dismissed

22     practically as quickly as it was filed.  So he -- I don't

23     see anything in here that's showing a violent past.

24          These folks are going to make sure that he follows the

10:55:18 25     rules.  These folks are going to make sure that he gets to

1       court.

2           They drove in this morning from Marion to come here to

3       be before you in hopes of being able to take Shiloh home

4       today.  But the point being:  They are willing and able to

10:55:36 5   help him out.  And I believe that, along with home

6       detention, along with some sort of electronic monitoring,

7       you are going to know whether he's going somewhere he's not

8       supposed to go.

9           As far as being a flight risk, I don't have any idea

10:55:54 10  what money he has that he could be flying anywhere.  That's

11      often something that's brought up by the Government and

12      sometimes even by the Court.  And the reality is, at least,

13      most of my clients don't have any circumstances -- their

14      financial circumstances are not such that even if they

10:56:16 15  wanted to flee, it wasn't going to happen.  And I think

16      clearly Shiloh doesn't have the ability to do that, the

17      financial means to do that, nor does he have the inclination

18      to do that.  He knows he needs to deal with this case.

19      Him fleeing is not going to help him, his family, or his

10:56:32 20  kids; so we respectfully request the Court consider

21      releasing him.

22          I think that these conditions do meet, you know, what

23      the bond statute asks for.  He's going to show up.  We're

24      going to know where he's at, and these custodians present a

10:56:48 25  situation where we know he's not going to be a danger to the

         1    community; so we respectfully request that he be released.

         2                    THE COURT:  Thanks.

         3             Anything further, Mr. Weldon?

         4                    MR. WELDON:  No, Your Honor.

10:57:06 5                    THE COURT:  So I think we're all in agreement

         6    that the proposed custodians are not the issue here.  First

         7    of all, I thank you folks for coming up here to be willing

         8    to put yourself on the line on this.  I join Mr. Weldon and

         9    Ms. Grill saying that you guys are typically exactly what

10:57:26 10   we're looking for in proposed custodians.  You're, by my

         11   observation, good people and you both looked me in the face

         12   and told me you would do this.  The problem is Mr. Jackson,

         13   who -- and I'm all about second and third chances, but from

         14   where I sit, I fear that he has an undiagnosed or

10:57:52 15   un-admitted drug addiction problem which has been smoldering

         16   in the background and certainly has popped up in terms of

         17   positive tests while he's been on court supervision.  Might

         18   well be an explanation for why he's never really had a

         19   verifiable job in his adult life.  And it's taken him to a

10:58:18 20   place that I'm sure, looking back on it, he wishes he never

         21   had been.  And you guys know I'm willing to reach out and

         22   meet people who are battling the throws of addiction, but I

         23   don't see any attempt at substance abuse therapy or anywhere

         24   in his past.  And frankly no one is here today saying he's

10:58:44 25   got an addiction problem and that was what was going on

1    here; instead, what I'm faced with is someone who there has

2    been probable cause determination that he was, in fact,

3    dealing in Fentanyl, which is probably one of the worst

4    problems we have right now.  And the thought of taking

10:59:08    5    along -- that he's either involved his brother or even -- he

6    has involved his brother whether his brother knew about it

7    or not.  That's deeply troubling to me as well just on so

8    many levels.

9        So, again -- I can't reiterate enough -- this isn't

10:59:30   10    about the proposed custodians.  I thank you once again, but

11    I can't find that proposed conditions of release here rebut

12    the presumption.  I think that this case is probably why the

13    presumption exists, and I just can't find that anything has

14    been rebutted here based on the totality of what I've heard.

10:59:50   15    And particularly, you know, while I agree with Mr. Weldon's

16    observation about the problems, I also agree a great deal

17    with Mr. Weldon's observations about the history and

18    characteristics of Mr. Jackson.

19        So that's going to be my ruling, and I just don't want

11:00:06   20    to give anybody a false sense that it's going to be

21    something different, and I just cannot find that the

22    presumption has been met.

23        So anything further, Mr. Weldon?

24                MR. WELDON:  Nothing from the Government, Your

11:00:18   25    Honor.

1          THE COURT:  Anything from the defendant?

2          MS. GRILL:  No, Your Honor.  Thank you.

3          THE COURT:  Court will be adjourned.

4          (Proceedings concluded at 11:00 a.m.)

5                        -   -   -

6                  **C E R T I F I C A T E**

7          I certify that the foregoing is a correct transcript
   of the record of proceedings in the above-entitled matter
8   prepared from my stenotype notes.

9          */s/ Stacey L. Kiprotich*          *08/21/2018*
           STACEY L. KIPROTICH, RMR, CRR            DATE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25